## THE NEPONSET.

(District Court, D. Massachusetts. April 23, 1918.)

### No. 1496.

TOWAGE ⊙⟂11(5)—LIABILITY OF TUG—NEGLIGENCE.

On a libel by the owner of a scow to recover damages for an injury alleged to have been caused by the negligent manner in which it was towed, *held*, that the tug was at fault in allowing the scow to strand on a well-known and charted shoal, and that there was no fault on the part of those in charge of the scow.

In Admiralty. Libel by the Bath Iron Works, Limited, against the tug Neponset. Decree for libelant.

Harrington, Bigham & Englar, of New York City, for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for claimant.

MORTON, District Judge. This is a libel by the owner of scow 57 to recover damages for an injury alleged to have been caused to the scow by the negligent maner in which it was towed by the respondent tug. The undisputed facts are as follows:

The libelant is the owner of the scow, which was launched new at Bath, Me., on July 30, 1916, and was to be used as a car float in New York Harbor. It was made of steel, about 265 feet long, 37 feet beam, and 3½ feet draft. It had square ends, sloped up from the bottom, which was flat, straight sides, and slightly rounded bilges; it was divided into 13 water-tight compartments. It had no means either of propulsion or of steering. It was towed by a steel bridle, about 90 feet long, attached from corner to corner at the bow, to which was fastened a manilla hawser. Two men, Charles Kingsbury and Albert Kingsbury, went as crew on it; but their duties were merely to attend to lights and ropes, and to give warning in case the scow got into trouble.

The Neponset is a powerful steam tug, drawing about 12 feet of water. She was employed to tow the scow from Bath to New York. She started with it on August 7, 1916, put into Portland that night, and the next day continued the voyage down the coast. At the beginning of the trip the scow was in good condition in every way. When the delivery point at Whitestone, near New York, was reached, it was found that the scow had received serious injuries. She was immediately dry-docked; examination showed that the bottom had been badly scraped, and that there was one hole in it, said to be large enough for a man to go through. The edges of the plates showed signs

of scraping along rocks, and pieces of rock and stones were found in the breaks. This was the testimony of the surveyor and the repair man, and in the absence of anything tending to show bias or prejudice on their part it is entitled, it seems to me, to the fullest weight. Upon the evidence it cannot be doubted, I think, that the scow stranded heavily during the voyage, and that her injuries were occasioned in that way. The tug's suggestion that they were caused by collision with a floating object is disproved by the clearly established facts in regard to the appearance of the bottom.

The libelant alleges that the stranding occurred on Stratford Middle Ground shoal, in Long Island Sound, through which the tow passed on its westward course. The testimony of the two Kingsburys supports this contention. They say, in substance, that about 9:30 p. m., on the day before the arrival at Whitestone, they felt the scow take bottom and bump and scrape along; that they looked around and saw on the starboard side of the scow, from 500 to 800 feet distant, the lighthouse on the Middle Ground shoal; that the scow was to the south of the lighthouse; and that the tug was ahead of her, at an angle of about 45 degrees on the starboard bow of the scow, about 80 fathoms away, which was the distance of the hawser and bridle. The correctness of this testimony is denied by the respondent; but there is no dispute that when the tug took the scow alongside, farther down the Sound, Charles Kingsbury went into the tug's pilot house and said to her master that the scow had struck bottom on the way. What answer the master made, if he made any, does not appear. He has died pending the litigation and without his testimony having been taken.

It is clear that the scow's injuries were not due to mismanagement by its crew, because it had no capacity to maneuver of itself, and was wholly under the control of the tug. There was no stress of weather at any point. There is no evidence of grounding at any other place than that stated by the scow's crew. The voyage was over familiar, well-charted waters. It has not been contended, and it is altogether unlikely, that in Long Island Sound there is some unknown and uncharted shoal so near the courses ordinarily followed as to have caused the injury. No place where the scow might have stranded is suggested by the tug. If the scow grounded on Middle Ground shoal, it is immaterial whether it grounded to the north, or to the south, of the lighthouse, or before or after dark, except that the testimony of the Kingsburys in regard to those matters may or may not so affect their credibility as witnesses as to occasion doubt whether the scow grounded as they state. No blame has been or could be imputed to them; they would have no motive to falsify, and they impressed me as intending to tell the truth. They were not very familiar with localities and navigating marks in the Sound; but in the broad outlines of their testimony it seems unlikely that they would be in error, viz. that they felt the scow strike, and immediately looked around in the dark, and saw that they were near a lighthouse distant from both shores. There is no place in the western part of the Sound answering that description except the Middle Ground shoal.

251 F.—48

On the other hand, no navigating log is produced by the tug; the testimony on her behalf is that none was kept. The libelant suggests that there must have been such a log and that it is not produced, because it would bear heavily against the tug. She carried only one man, Lewis, who was licensed for Long Island Sound; and it is admitted that, for a part of the run through the Sound, she was being navigated by men not licensed for those waters, and was towing on a hawser somewhat longer than permitted by government regulations. These are, perhaps, minor matters; but they indicate a certain laxity of management and discipline, which has been held relevant on the question of negligence. I doubt whether the men on the tug have any independent, accurate recollection of the time at which they passed various points in the voyage which they had no occasion to notice. Their testimony is founded, I think, on the statement in the engineer's log. He was under no duty to make such entries. The book in which they should have been made, the navigating log, either was not kept, or is not produced. There are irreconcilable differences in the testimony offered by the opposing parties; but, upon the whole evidence, I am satisfied that the scow grounded on Middle Ground shoal, as alleged.

During most of the voyage, the tug, as all the witnesses on the point agree, held a position, not in front of the scow, but on her starboard bow. She was in that position, the Kingsburys testify, at the time of the accident. The Middle Ground shoal was briefly described by Capt. Lewis. That the tug could have passed safely 200 feet nearer the lighthouse than the scow which grounded, which is in effect what the Kingsburys testify happened, seems extremely improbable, if Capt. Lewis' description is accurate. On the other hand, if the tow, which was going west, attempted to pass to the north of the Middle Ground and ran too close to it, the tug, being farther off than the scow, might have gone clear, although the scow struck. Such a supposition would adequately account for the accident, and, all things considered, seems to me the most reasonable explanation of it.

As the Middle Ground shoal was well known and charted, the tug's fault in stranding the barge on it is too obvious to require discussion. Cobb v. Tug Coastwise, 233 Fed. 1, 147 C. C. A. 71. It follows that there must be a decree adjudging the tug solely at fault.